**MATRIX HEALTH GROUP**
*d/b/a BioMatrix*,

      Plaintiff,

v.

**JOHN SOWERSBY,**
*and* **INFUCARE**,

      Defendants.

_____/

**ORDER**

    **THIS MATTER** comes before the Court upon the parties' cross-motions for summary judgment [ECF Nos. 66 & 69].[1] In its Amended Complaint ("Am. Compl.") [ECF No. 41], the Plaintiff, Matrix Health Group ("BioMatrix"), asserts eight claims: Breach of Contract against John Sowersby (Count I); Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, against both Sowersby and InfuCare (together, the "Defendants") (Count II); Violation of Florida's Uniform Trade Secret Act ("FUTSA") against the Defendants (Count III); Tortious Interference with Contract against InfuCare (Count IV); Breach of the Duty of Loyalty against Sowersby (Count V); Tortious Interference with Business Relationships against Sowersby (Count VI); Civil Conspiracy to Commit Tortious Interference with Business Relationships against the Defendants (Count VII); and Unjust Enrichment against the Defendants (Count VIII).

---

[1] Both the Plaintiff's Motion for Partial Summary Judgment ("Pl. MSJ") [ECF No. 66] and the Defendants' Motion for Summary Judgment ("Def. MSJ") [ECF No. 69] are fully briefed: The Defendants filed a Response in Opposition to the Plaintiff's Motion for Partial Summary Judgment ("Def. Resp. MSJ") [ECF No. 78], and the Plaintiff has filed a Reply ("Pl. Reply") [ECF No. 81]. The Plaintiff likewise filed a Response in Opposition to the Defendants' Motion for Summary Judgment ("Pl. Resp. MSJ") [ECF No. 76], to which the Defendants have Replied ("Def. Reply") [ECF No. 82].

Although the Defendants claim that they have moved for summary judgment "on all claims contained in the Amended Complaint," *see* Def. MSJ at 2, they have included briefing and argument only as to Counts I-V. *See generally* Def. MSJ. Accordingly, the Court hereby summarily **DENIES** their Motion as to Counts VI-VIII. *See Singh v. U.S. Atty. Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009) ("[S]imply stating that an issue exists, without further argument or discussion," is not sufficient to preserve a party's right to contest that issue). For their part, BioMatrix seeks summary judgment only as to Counts I-V of the Amended Complaint. *See generally* Pl. MSJ.

The Court held a hearing on May 20, 2019, at which the parties presented their oral arguments. For the reasons set out below, the Court hereby **DENIES** both motions for summary judgment.

## THE FACTS[2]

BioMatrix provides Intravenous Immunoglobulin Therapy ("IVIG"), a type of blood infusion treatment for patients with certain medical conditions. Pl. Statement of Material Facts ("Pl. SMF") [ECF No. 67 ¶ 1]. BioMatrix "maintains" information with respect to "which patients are eligible for certain products based on their particular insurance plans and which patients are eligible for certain insurance benefits . . . and which plans provide the most profitability for BioMatrix." *Id.* ¶ 2. BioMatrix also employs "sales representatives"—like Sowersby—to "maintain and support" its patients by answering their questions and coordinating with their nurses and treating physicians. *Id.* ¶ 6. BioMatrix hired Sowersby in July 2014 and assigned him to manage its central and north Florida regions. *Id.* ¶ 7.[3] The parties disagree over Sowersby's precise

---

[2] Unless otherwise specified, the following facts are undisputed.
[3] This is roughly the same territory Sowersby now serves as a sales representative for InfuCare. *Id.* ¶ 60.

role at BioMatrix. But it suffices to say here that he was tasked with developing relationships with physicians whom, BioMatrix hoped, would later refer their patients to BioMatrix for IVIG treatment. *Id.* ¶¶ 15-18.

When he was hired, Sowersby signed, among other documents, an "Offer of Employment and Employment Contract," an "Employment Code of Conduct Agreement," and an "Employee Handbook Receipt and Acknowledgement." *Id.* ¶¶ 10-12. While the parties quibble over the legal effect of these documents, they do not dispute that Sowersby signed them.

In March of 2018, an InfuCare representative contacted Sowersby about leaving BioMatrix and joining InfuCare. Pl. SMF ¶ 29. By April 4, 2018, InfuCare had offered Sowersby a job. *Id.* ¶ 31. On April 14, 2018, Sowersby signed and returned to InfuCare the offer letter he had received ten days earlier. *Id.* ¶ 32. Although InfuCare admits that Sowersby began to discuss transferring patients from BioMatrix to InfuCare prior to notifying BioMatrix of his intent to resign, the parties fiercely dispute whether Sowersby *caused* the patients to switch over; whether, instead, the patients' treating physician caused the switch; or whether the patients themselves made an independent decision to leave BioMatrix for InfuCare. *Id.* ¶¶ 37-51. On this point, however, Sowersby's testimony is clear: he hoped to have "as many patients as possible" follow him from BioMatrix to InfuCare. *Id.* ¶ 52. The parties agree that, in the end, six patients Sowersby had worked with at BioMatrix transferred from BioMatrix to InfuCare. *Id.* ¶ 63.

Sowersby's employment with InfuCare began on May 1, 2018. Defendants' Statement of Material Facts ("Def. SMF") [ECF No. 77 ¶ 30]. On May 11, 2018, after receiving a cease and desist letter from BioMatrix's legal counsel, InfuCare's owner, Deven Patel, sent Sowersby an e-mail, in which he "acknowledge[d]" Sowersby's "restrictive covenant" with BioMatrix. Pl. SMF ¶ 61. BioMatrix contends that, although InfuCare knew of Sowersby's "restrictive covenant"

before that e-mail, it nevertheless "allowed Sowersby to continue breaching [his] restrictions." Def. SMF ¶ 31.

BioMatrix now seeks to recover (1) the $131,278 in "gross profit loss" it says it suffered in 2018 as a result of the loss of the six patients to InfuCare; and (2) an additional $1,650,105 that, it claims, will constitute its future lost profits over the next nine years (beginning in 2019). Def. SMF ¶ 44.

## THE LAW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable factfinder to rule for the non-moving party. *Id.*

At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See e.g., Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party satisfies

its initial burden, the burden shifts to the non-moving party to come forward with evidence that a genuine issue of material fact precludes summary judgment. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); FED. R. CIV. P. 56(e). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). Notably, assessments of credibility—no less than the weighing of evidence—are fact questions not susceptible of disposition at summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). The Court must analyze the record as a whole—and not just the evidence the parties have singled out for consideration. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987). If there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)).

## ANALYSIS

### 1.    The Declaration of Dr. Raam Sambandam

The Defendants attached to their Motion for Summary Judgment a declaration from Dr. Raam Sambandam, the physician who treated the six patients at issue here. *See* Dr. Sambandam Decl. [ECF No. 70-10]. In its Response to the Defendants' MSJ, BioMatrix asks the Court not to consider this declaration because the Defendants failed to disclose Dr. Sambandam as a witness in the Initial Disclosures they filed under Federal Rule of Civil Procedure 26. Pl. Resp. MSJ at 3-5.

But the Federal Rules of Civil Procedure make clear that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

failure was substantially justified *or is harmless*." FED. R. CIV. P. 37(c)(1) (emphasis added). And the Rules' Committee Notes explain that "[l]imiting the automatic sanction to violations 'without substantial justification,' coupled with the exception for violations that are 'harmless,' is needed to avoid unduly harsh penalties in a variety of situations: *e.g.,* the inadvertent omission from a Rule 26(a)(1)(A) disclosure *of the name of a potential witness known to all parties* . . . ." FED. R. CIV. P. 37(c)(1) advisory committee's note to 1993 amendment (emphasis added). This exception is, of course, consistent with the purpose behind Rule 26's disclosure requirement: to provide the parties with an adequate opportunity to conduct discovery on relevant sources of information about which they would otherwise (and unfairly) remain ignorant. *See* FED. R. CIV. P. 26(e) (requiring that a "party who has made a disclosure under Rule 26(a) . . . supplement or correct its disclosure" only if "the party learns that in some material respect the disclosure or response is incomplete or incorrect, *and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing*") (emphasis added).

Unsurprisingly, then, courts in this Circuit routinely hold that a party's failure to disclose a witness is "harmless" for purposes of Rule 37(c)(1) where, as here, the opposing party knew of the undisclosed witness. *See Brown v. Chertoff*, No. 406CV002, 2009 WL 50163, at *4-5 (S.D. Ga. Jan. 7, 2009) *aff'd sub nom. Brown v. Napolitano*, 380 F. App'x 832 (11th Cir. 2010) (denying motion *in limine* where the plaintiff "was aware of the identities of [non-disclosed witnesses] during discovery and could have sought to depose them had he chose to do so"); *Wajcman v. Inv. Corp. of Palm Beach*, No. 07-80912-CIV, 2009 WL 465071, at *5 (S.D. Fla. Feb. 23, 2009) (denying motion *in limine* where party was well aware of non-disclosed witness' existence and significance); *Burden v. City of Opa Locka*, No. 11-22018-CIV, 2012 WL 4764592, at *8 (S.D. Fla. Oct. 7, 2012) (plaintiffs were unable to demonstrate that the failure to provide them with [non-

disclosed witness's declaration] was not harmless because the witness was referenced in the plaintiffs' own complaint); *Wolfe v. Sec'y, Dep't of Corr.*, No. 5:10-CV-663-OC-PRL, 2012 WL 6740732, at *1 (M.D. Fla. Dec. 30, 2012) ("The Court agrees that the identity of [non-disclosed witness] was made known to Plaintiff during the discovery process, and thus, his testimony will be permitted. [Non-disclosed witness] was identified . . . during the deposition of Defendant's medical expert."); *Cardinal Health, Inc. v. Delivery Specialists, Inc.*, No. 10-20555-CIV-UNGARO, 2011 WL 845915, at *5 (S.D. Fla. Mar. 8, 2011) (denying motion to strike declaration submitted in support of summary judgment where party should have known of undisclosed witness' existence prior to the filing of the opposing party's summary judgment motion in light of the witness' identification during discovery).

There is no question that Dr. Sambandam—and the relevant information he possessed—was "made known to [BioMatrix] during the discovery process." To begin with, both Dr. Sambandam's name and his role in the events that precipitated this lawsuit were referenced dozens of times during Sowersby's deposition. *See generally* Sowersby Dep. [ECF No. 68-1 & 68-2]. Indeed, Sowersby testified about meeting with Dr. Sambandam just before he left BioMatrix—and specifically testified that, at this meeting, the two discussed the possibility that Dr. Sambandam might begin sending his patients to Sowersby at InfuCare. Sowersby Dep. 116:2-19 [ECF No. 68-1 at 30]. Dr. Sambandam was also a focal point of the deposition of BioMatrix's own 30(b)(6) witness, Jordan Stone. *See* Stone Dep. [ECF No. 68-3:18]. In fact, Stone testified that the majority of the 21 patients Sowersby served at BioMatrix were patients of Dr. Sambandam. Stone Dep. 17:13-17 [ECF No. 68-3 at 17].

BioMatrix cannot now credibly claim to have been surprised that Dr. Sambandam "ha[d] information relevant to [the] Defendants' defenses." Pl. Resp. MSJ at 3. To the contrary, BioMatrix

had every opportunity to take Dr. Sambandam's deposition during the more than seven months of discovery the parties received—and simply chose not to do so. The Defendants' failure to disclose Dr. Sambandam's testimony in their Rule 26(a) disclosures was therefore "harmless," FED. R. CIV. P. 37(c)(1)—and, to the extent it was not, its harmfulness resulted chiefly from BioMatrix's own decision not to pursue his deposition. *See Cardinal Health, Inc.*, 2011 WL 845915 at *5 (noting that a party does not violate Rule 26 where the complaining party must have been aware of the "likelihood of the declarant being a witness in this matter due to the declarant's name appearing multiple times" during discovery). Accordingly, the Court can and will consider Dr. Sambandam's declaration.

## 2. Count I: Breach of Contract against Sowersby

BioMatrix and Sowersby each move for summary judgment as to Count I of the Amended Complaint. To establish a breach of contract under Florida law, the plaintiff must show: (1) a valid contract; (2) a material breach; and (3) damages resulting from the breach. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). Damages in a breach of contract action are recoverable only where they were proximately caused by, and naturally flow from, the breach. *See, e.g.*, *Vanmoor v. King*, No. 06-60115-CIV, 2006 WL 8432493, at *3 (S.D. Fla. Aug. 2, 2006) (describing the third element of a breach of contract claim as "damages as a proximate cause of [the] breach").

As a preliminary matter, there is no dispute that Sowersby signed three documents when he was hired at BioMatrix—an "Offer of Employment and Employment Contract," and "Employment Code of Conduct Agreement," and an "Employee Handbook Receipt and Acknowledgement." Pl. MSJ at 14-16. Instead, the parties disagree about the enforceability of these documents, whether Sowersby actually breached the specific terms of each document, and

whether any of BioMatrix's claimed damages were proximately caused by the alleged breach of these documents.

BioMatrix posits that each individual document constitutes a separately enforceable contract—and that Sowersby breached salient provisions of each. *Id.* Specifically, BioMatrix avers that Sowersby breached (1) the Employment Contract, which prohibited him from "rendering services or engaging or participating in business activities that would interfere with his duties to BioMatrix or compete with BioMatrix," when he solicited patients for InfuCare while he was a BioMatrix employee; (2) the Code of Conduct Agreement, which prohibited him from soliciting or servicing BioMatrix patients for another company and from disseminating confidential BioMatrix client records; and (3) the Employee Handbook, which similarly prohibited him from using or sharing confidential or proprietary information regarding marketing strategies, customer lists, pricing policies, or other related information. *Id.*

Sowersby counters that none of the documents bound him in any way and that, even if they did, BioMatrix issued an employment handbook in 2017, which "disclaim[s] the existence of any enforceable employment contract unless the document is signed by BioMatrix's CEO, Bruce Greenberg." Def. Resp. MSJ at 4-5. Specifically, Sowersby argues that the "General Handbook Acknowledgement" he signed in July of 2017—which recognizes that "no representative of BioMatrix other than the CEO may alter 'at will' status and any such modification must be in a signed writing"—released him from the terms of both the restrictive covenant and the code of conduct he signed three years before. *See* 2017 General Handbook Acknowledgement [ECF No. 70-3]; Def. Resp. MSJ at 4-5. But a plain reading of this Acknowledgment reveals that it did no such thing. In fact, the Acknowledgment simply clarifies that Sowersby's *at-will employment* may be modified only by a signed writing from BioMatrix's CEO. It thus says absolutely nothing

about—and in no way alters the effect of—either the restrictive covenant or the code of conduct to which Sowersby was, as ever, bound. Moreover, as BioMatrix correctly notes, "release" is an affirmative defense to a breach of contract claim and, as such, must be raised in a responsive pleading to the Amended Complaint. *U.S. ex rel. Ragghianti Foundations III, LLC v. Peter R. Brown Const., Inc.*, No. 8:12-CV-942-T-33MAP, 2014 WL 103457, at *11 (M.D. Fla. Jan. 10, 2014) (holding that a party cannot assert the affirmative defense of "release" at the summary judgment stage); *see also Rakip v. Paradise Awnings Corp.*, 514 F. App'x 917, 920 (11th Cir. 2013) ("Release is an affirmative defense, and a party must plead it or it is waived."). Because Sowersby did not raise "Release" as an affirmative defense in his Answer, *see generally* Sowersby Answer [ECF No. 45], he has waived that defense.

Nevertheless, the Court cannot enter summary judgment for BioMatrix as to Count I. Although, as BioMatrix points out, Florida law permits the enforcement of restrictive covenants against at-will employees (element one)[4]—and despite ample evidence that Sowersby breached each of his employment "contracts" (element two)[5]—there remains a genuine dispute over a material fact: whether BioMatrix's claimed damages were proximately caused by Sowersby's breach.

On this point, Sowersby says that BioMatrix cannot establish proximate causation because it was Dr. Sambandam who "took it upon himself" to refer BioMatrix's patients to InfuCare. Def. Resp. MSJ at 6; *see also* Def. MSJ at 4-6. Indeed, Dr. Sambandam's unrebutted declaration attests that Sowersby could not, on his own, transfer patients to InfuCare—and that he (Dr. Sambandam)

[4] *See, e.g., Open Magnetic Imaging, Inc. v. Nieves-Garcia*, 826 So. 2d 415 (Fla.3d DCA 2002) (discussing the enforceability of restrictive covenants vis-a-vis an at-will employee).
[5] *See, e.g.*, Pl. Reply MSJ at 4 (describing Sowersby's plans for transferring patients from BioMatrix to InfuCare without InfuCare's knowledge).

made the independent decision to refer the six patients in question to InfuCare. *See* Dr. Sambandam Decl. ¶¶ 4-6. Because BioMatrix elected—for reasons that are entirely unclear—not to take the depositions of either Dr. Sambandam or the six patients, there is now a genuine dispute as to whether the patients left BioMatrix because of: (1) Sowersby's stratagems; (2) Dr. Sambandam's referrals; or (3) the patients' own independent decisions. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007). Accordingly, the parties' respective Motions for Summary Judgment as to Count I of the Amended Complaint are **DENIED**.

**3.      Counts II & III: Violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. §§ 688.01,** *et seq.*

To establish a violation of Florida's Uniform Trade Secrets Act ("FUTSA"), a plaintiff must prove that: "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001). Under FUTSA, "[t]o qualify as a trade secret, information must derive economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy." *Id.* at 1291.

Similarly, the federal Defend Trade Secrets Act ("DTSA") describes a trade secret as any information about which: (1) the owner has taken reasonable measures to keep secret; and (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can

obtain economic value from the disclosure or use of the information. *See M.C. Dean, Inc.*, 199 F. Supp. 3d 1349, 1353 (S.D. Fla. 2016).

The parties do not argue that BioMatrix's trade secret misappropriation claims turn on which statute—FUTSA or DTSA—applies, so the Court may analyze the substance of the Plaintiff's claims simultaneously. *See Temurian v. Piccolo*, No. 18-CV-62737, 2019 WL 1763022, at *10 (S.D. Fla. Apr. 22, 2019) ("The parties agree that analysis of the [FUTSA and DTSA] claims is substantively identical. Therefore, the Court analyzes them together.").

BioMatrix contends that certain confidential material in its possession—including monthly patient lists, patient diagnosis and prescription information, pricing information, reimbursement/profit data, financial reports, patient health information, historical referral sources, and other related company strategies—constitute trade secrets it took "reasonable" steps to protect. Pl. MSJ at 13-14; Pl. Resp. MSJ at 9-10. According to BioMatrix, these "reasonable" steps included utilizing password-protected databases, prohibiting employees from removing or sharing certain files, and requiring employees to sign agreements to maintain the secrecy of the information. *Id.* at 14. BioMatrix also says that the Defendants misappropriated these trade secrets when Sowersby disclosed, and InfuCare used: (1) information concerning BioMatrix's revenue and profit margins; (2) data relating to Florida insurance reimbursements; (3) analysis of the kinds of referrals that yield the "biggest profit margins"; and (4) patient lists and patient contact information. *Id.* at 15-16.

The Defendants respond that this amalgam of data does not constitute a "trade secret" under either FUTSA or DTSA—and that, in any event, BioMatrix cannot show that Sowersby accessed or otherwise misappropriated *any* confidential information. Def. Resp. MSJ at 8-12. Sowersby, for his part, says that, because he received little training from BioMatrix, he intrepidly researched a

variety of websites and industry databases with the object of compiling lists of physicians who "might be referral sources for IVIG patients." Def. MSJ at 12. And, the Defendants add, because all of the physicians Sowersby recruited to BioMatrix were "easily" identifiable through publicly available information, Sowersby did not *need* to misappropriate BioMatrix's records to contact the physicians who ultimately became the original sources of his referrals. Def. MSJ at 17. Nor, the Defendants argue, could either the patients or their doctors "reasonably" be prohibited from "discussing" patient care with Sowersby. *Id.* Put simply, the Defendants suggest that Sowersby did not, as it were, take anything that belonged to BioMatrix—at least not anything he had not separately researched on his own and then stored in his own memory.

But "[c]ourts are extremely hesitant to grant summary judgment regarding the fact-intensive questions of the existence of a trade secret or whether a plaintiff took reasonable steps to protect its trade secrets." *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134 (M.D. Fla. 2007) (citing *Lear Siegler, Inc. v. Ark–Ell Springs, Inc.,* 569 F.2d 286, 289 (5th Cir. 1978)). Indeed, "[t]he term 'trade secret' is one of the most elusive and difficult concepts in the law to define. The question of whether an item taken from an employer constitutes a 'trade secret,' is of the type normally resolved by a fact finder after full presentation of evidence from each side." *Id.* at 1141 (cleaned up). Despite the parties' extensive give-and-take on this issue, the Court is not persuaded that summary judgment is the most appropriate—or, for that matter, the most effective—mechanism for adjudicating "the fact-intensive questions of the existence of a trade secret or whether a plaintiff took reasonable steps to protect its trade secrets." *Id.* at 1134.

Presaging this argument, the Defendants point out that "Florida courts have long held that a customer list is not entitled to trade secret protection unless the party seeking trade secret protection can demonstrate that it invested significant time and expense to compile the information

contained in the customer list." Def. MSJ at 12-16 (citing *Yellowfin Yachts, Inc. v. Baker Boatworks, LLC*, 898 F.3d 1279, 1299 (11th Cir. 2018)). And, the Defendants say, because Sowersby testified that he compiled much of these customer lists "on his own," BioMatrix could not have spent "significant time and expense to compile the information." *Id.* But there are at least three major problems with this argument. *First*, the customer lists at issue here include far more than just patient names. To list but one example, the data apparently contains important patient profile information, such as the precise expiration date of a given patient's prescription—information that, as Sowersby conceded, could be used to predict how likely that patient might be to switch providers. Pl. SMF ¶ 48. *Second*, the Court may not, and should not, be in the business of adjudicating quintessentially factual questions—such as whether the "time and expense" BioMatrix invested in the compilation of the information at issue here was, or was not, "significant." To the contrary, these are precisely the kinds of factual disputes that jurors are best-equipped to resolve. *See Marlite, Inc. v. Eckenrod*, No. 09-22607-CIV, 2011 WL 39130, at *5 (S.D. Fla. Jan. 5, 2011), *aff'd sub nom. Marlite, Inc. v. Am. Canas*, 453 F. App'x 938 (11th Cir. 2012) ("Whether a particular type of information constitutes a trade secret is a question of fact."). *Third*, much of Sowersby's argument turns on his testimony that he compiled this data "on his own"—that, as counsel explained at oral argument, he simply kept all of this information stored somewhere in the recesses of his prodigious memory. But "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). And, on this issue (if not others), a jury may well disbelieve Sowersby's account.

Finally, although the parties do not brief the issue, whether the measures Biomatrix employed to protect its trade secrets were reasonable is a highly "fact-intensive inquiry" not susceptible of straightforward resolution at summary judgment.[6] *See Balearia Caribbean, Corp. v. Calvo*, No. 16-23300-CIV, 2018 WL 6261497, at *4 (S.D. Fla. Aug. 22, 2018).

To summarize, then, the parties dispute the three most salient trade-secret issues in the case: (1) whether the information in question constitutes a "trade secret" in the first place; (2) whether BioMatrix took reasonable steps to protect that information; and (3) whether the information was actually misappropriated. Indeed, the only pertinent fact the parties agree on is that six of Sowersby's patients left BioMatrix for InfuCare shortly after he himself resigned from BioMatrix. But why they left—and, no less significant, what pieces of information Sowersby employed to effectuate their transfer—remain hotly contested questions of fact for the jury, not questions of law for the Court.

Accordingly, the parties' Motions for Summary Judgment on Counts II and III of the Amended Complaint are **DENIED**.

### 4. Count IV: Tortious Interference with Contract against InfuCare

In Florida, the elements of a tortious interference with contract claim are: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional

---

[6] After all, the answer depends, to a great degree, on how one balances the cost that might be inflicted if the information were released, together of course with the risk that the information might in fact be released, against the cost of protecting it from release—all questions that, again, implicate a potentially-innumerable range of variegated policy norms: viz. how much should a company pay per employee to protect its trade secrets? Or is cost per employee not nearly the appropriate metric at all? Should smaller companies implement different protocols than large ones? Should technology companies be treated differently than manufacturers, clothing retailers, or, as here, medical providers? Should customer information receive different protections than, say, proprietary business secrets? And so on. In a democracy—representative or otherwise—unelected judges are simply unfit to make these normative calls.

procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach. *Sourcing Sols. USA, Inc. v. Kronos Am., LLC*, No. 10-23476-CIV, 2011 WL 13223514, at *3 (S.D. Fla. Jan. 26, 2011) (citations omitted).

According to BioMatrix, InfuCare's owner, Deven Patel, knew about the restrictive covenant Sowersby had signed when he started at BioMatrix—and yet, despite this knowledge, he still allowed Sowersby to bring his BioMatrix patients over to InfuCare. Pl. MSJ at 12-13. But, as InfuCare correctly points out, on April 5, 2018—before the start of Sowersby's employment with InfuCare—Patel asked Sowersby whether, after leaving BioMatrix, he would be subject to any restrictive covenants. *See* [ECF No. 68-16 at 139]. And Sowersby unequivocally responded that "I DO NOT have a Non-Compete, Non-Solicit, nor Restricted Covenants post employment with my current company." *Id.* at 140 (emphasis in original). As this exchange makes clear, there is a genuine dispute of material fact with respect to whether InfuCare *intentionally* procured a breach of Sowersby's restrictive covenant.

BioMatrix alternatively contends that, even if InfuCare did not know about Sowersby's restrictive covenant until May 11, 2018—when Patel received notice of it from BioMatrix's legal counsel—InfuCare's unwillingness to disavow Sowersby's actions resulted in additional breaches. Pl. Reply MSJ at 7-8. But this argument is, for two reasons, unpersuasive. *First*, although somewhat unclear from the briefing, it appears that all six patients left BioMatrix *before* May 11, 2018. Pl. SMF ¶¶ 63-64. Indeed, Sowersby testified that, after Patel instructed him, in the May 11 email, to "abide by [his] restrictive covenant" with BioMatrix, he "stopped" all efforts to transfer further patients to InfuCare. *See* Sowersby Dep. 233-234 [ECF No. 68-1 at 59-60]. BioMatrix does not explain how InfuCare could have intentionally breached a contract it did not know about until *after* the alleged breach occurred.

*Second*, and perhaps more important, the fifth element of a tortious interference claim is identical to the third element of a breach of contract claim: both require the plaintiff to prove "damages resulting from the breach"—that is, that the plaintiff's damages were proximately caused by the breach. *See Chipman v. Chonin*, 597 So. 2d 363, 364 (Fla. 3d DCA 1992) ("In breach of contract actions, a plaintiff may recover only if the damages were a proximate result of the breach."). Thus, even if BioMatrix could establish (beyond dispute) that InfuCare knew about the restrictive covenant before the patients transferred over, the same causation questions that precluded summary judgment on BioMatrix's breach of contract claim likewise preclude it here. Again, neither party has conclusively shown whether BioMatrix's damages "resulted from" InfuCare's intentional procurement of the breach—rather than from some separate intervening cause, such as because the patients decided, on their own, to switch to InfuCare or because Dr. Sambandam persuaded them to do so. "Suffer[ing] damages," standing alone, is simply insufficient to justify the entry of summary judgment. *See* Pl. MSJ at 17.

Accordingly, the parties' respective Motions for Summary Judgment as to Count IV of the Amended Complaint are **DENIED**.

5.     **Count V: Breach of the Duty of Loyalty against Sowersby**

Although the parties refer to Count V as a "duty of loyalty" claim, it is in fact a claim that Sowersby breached a fiduciary duty. Under Florida law, the elements of a breach of fiduciary duty claim are: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damages proximately caused by that breach. *Lesti v. Wells Fargo Bank, N.A.*, 960 F. Supp. 2d 1311, 1323 (M.D. Fla. 2013) (citing *Miller v. Miller*, 89 So.3d 962 (Fla. 5th DCA 2012)). As with BioMatrix's breach of contract claim, genuine disputes of material fact with respect to whether any of

BioMatrix's claimed damages flowed proximately from Sowersby's purported breach naturally preclude summary judgment as to Count V.

### 6. The "Lost Profits" Claim

Finally, the Defendants ask for summary judgment on BioMatrix's "lost profits claim," because, they say, the claim is too speculative to proceed. Def. MSJ at 7-9. But, at the summary judgment stage, a party need not present exacting proof of the precise amount of lost profits it intends to claim. *See May v. Nygard Holdings Ltd.*, 203 F. App'x 949, 951 (11th Cir. 2006). And the Defendants do not suggest that BioMatrix has suffered no damages, that "lost profits" are unavailable for the claims BioMatrix has made, or that BioMatrix could make no more specific accounting of its damages at trial.

That said, at trial, BioMatrix must be prepared to provide the jury with a reasonable standard for calculating its "lost profits claim." *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1218 (11th Cir. 2006) ("Florida law clearly does not require that the amount of lost profits be *certain* . . . the law does [however] require a reasonable standard for calculation [for the jury].") (emphasis added). Put another way, even if BioMatrix can prove that the Defendants proximately caused its damages, BioMatrix must still give the jury an "adequate yardstick" by which to calculate its "lost profits." *Id.* Whether BioMatrix can meet this standard with admissible evidence is, of course, a question the Court will resolve at trial.

\* \* \* \* \*

Accordingly, the Court hereby

**ORDERS AND ADJUDGES** as follows:

1. The Plaintiff's Motion for Partial Summary Judgment [ECF No. 66] is **DENIED**.

2. The Defendants' Motion for Summary Judgment [ECF No. 69] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 6th day of October 2019.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record